IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 22, 2025

**STATE OF TENNESSEE v. ROBERT KING VAUGHN, JR.**

**Appeal from the Criminal Court for Trousdale County**
**No. 2019-CR-74     Brody N. Kane, Judge**

_____

**No. M2024-00028-CCA-R3-CD**

_____

Defendant, Robert King Vaughn, Jr., appeals his convictions for attempted first degree murder and aggravated rape, for which he received a total effective sentence of 120 years' confinement. Defendant contends that: (1) the evidence presented at trial was insufficient to support his conviction for attempted first degree murder; (2) no reasonable trier of fact could find that he failed to establish the insanity defense by clear and convincing evidence; and (3) the prosecutor engaged in improper argument by misstating Tennessee law and vouching for witnesses during the State's closing argument. Following a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and TIMOTHY L. EASTER, JJ., joined.

Kendall Stivers-Jones (on appeal), Assistant Public Defender—Appellate Division of the Tennessee District Public Defender's Conference; Shelley Thompson Gardner; District Public Defender; and Kelly A. Skeen, Nick Clemmons, John A. Gholson, IV, and Sharon J. Linville (at trial), Assistant District Public Defenders, for the appellant, Robert King Vaughn, Jr.

Jonathan Skrmetti, Attorney General and Reporter; Richard D. Douglas, Senior Assistant Attorney General; Jason Lawson, District Attorney General; and Ian Daniel Bratton and Thomas H. Swink, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## I. Factual and Procedural History

On August 30, 2019, Defendant, an inmate at the Trousdale Turner Correctional Center (TTCC), assaulted, raped, and repeatedly stabbed a female counselor while the two were inside her office. In connection with the offense, the Trousdale County Grand Jury indicted Defendant for aggravated rape and attempted first degree premeditated murder with serious bodily injury. Prior to trial, Defendant filed a notice of his intent to assert the affirmative defense of insanity.

At trial, Chianne Golden, a former corrections officer at TTCC, testified that days before August 30, 2019, she heard Defendant say that, if he was denied parole, he was going to stab the victim. Ms. Golden stated that she wrote up Defendant after he threatened to stab the victim.

On cross-examination, Ms. Golden agreed that Defendant also threatened to stab her and Sergeant Anderson. She stated that Defendant told her he was not on his medication; she said that she believed this because Defendant was "up all night" and not acting like himself. Ms. Golden testified that she reported Defendant's behavior to her sergeant but that "[n]othing was done" to address the issue.

On redirect, Ms. Golden agreed that one reason Defendant could have been denied medication at TTCC was the use of methamphetamine. Ms. Golden stated that she also wrote up Defendant for misconduct, explaining that he was "grabbing his genital area in a sexual manner" and that she "asked him to stop repeatedly and he did not."

The victim[1] testified that she had worked at TTCC as a mental health coordinator in August 2019 and that, as part of her job, she had provided mental health therapy to Defendant and other inmates. She said that Defendant had a care "level of two," which meant that he had a mental health diagnosis. The victim explained that on August 30, 2019, she was in the process of moving out of her office in the Whiskey-Alpha pod into an office in the Whiskey-Bravo pod when she had an unplanned encounter with Defendant. The victim stated:

> [Defendant] came to my door, and knocked on it, to talk about seeing
> . . . the mental health psychiatric provider . . . for medication. I explained to
> him that I could not give him a referral . . . because he was using at the time.
> And so, . . . we discussed that. He was more than willing to attempt to get

---

[1] It is the policy of this court to protect the identity of victims of sexual offenses.

clean that day. He wanted to bring me his drug paraphernalia. And so, he left my office.

The victim explained that Defendant had been taken off his medication after a failed drug test. She said that, when Defendant returned to her office, he sat down holding a book and a coffee bag. She testified:

[Defendant] flipped through the book and it had . . . brown paper in it, which was used to roll cigarettes, you know, and items they smoked. And the coffee bag had a brand new light bulb in it, which was odd to me, because normally the light bulb would have been used to smoke other drugs in it. I turned and . . . got my, the trash bag or the trash out from under another table, and I turned for him to drop it in it, I remember twisting the corner of the bag and turning back around, and the next thing, [Defendant] was around my table, and that's when he hit me.

The victim testified that she did not remember much after "the first punch[.]" She said that she recalled a nurse working on her and telling her that her pants had been removed. She said she remembered "the sound of the life-flight helicopter" and water "streaming down [her] face, when they stapled [her] . . . skin back together."

The victim testified that she was taken to Vanderbilt University Medical Center ("Vanderbilt"), where she stayed for twelve days after the assault. Regarding her injuries, the victim stated, "They . . . had to remove my left eye, and they rebuilt the upper eye socket, the lower eye socket, the right bottom floor. They had to redo my nose." She explained that she had stitches above her eyebrow and staples in her head. She said that she still had scars from knife wounds on her cheek, chin, collarbone, arm, fingers, ear, and neck. The victim recounted that she had undergone approximately seven surgeries and that she had needed a tube placed in her chest because of a collapsed lung. She said that she had permanent scarring on her face and suffered from migraines. The victim said that she had been diagnosed with Post-Traumatic Stress Disorder following the assault and that her ability to concentrate and her memory had been impaired. She testified that she had a master's degree in counseling but that she was permanently disabled due to Defendant's assault and was not able to work.

The victim testified that she never consented to any sexual contact with Defendant. She further testified that she had not been menstruating at the time of the assault and that she had not had sexual contact with anyone in the week leading up to August 30, 2019. She stated that she did not have large bruises on her thigh before the incident.

On cross-examination, the victim explained that "the reason [Defendant] needed to get clean" was because the advanced practice nurse would not prescribe Defendant his medication otherwise. The victim testified that, when speaking to Defendant immediately prior to the attack, he did not express to her that he was having any "mental health issues[.]"

Monica Thames testified that, on August 30, 2019, she was working in the Whiskey-Charlie pod at TTCC as the "pod officer." She explained that she was not a corrections officer but a case manager and that she was serving as the pod officer that day because the facility was understaffed. Ms. Thames recalled that a "code" was called by the pod officer in the Whiskey-Bravo pod. She said that she ran to the victim's office in that pod, where she saw the victim "lying on the floor in a puddle of blood." Ms. Thames said that the victim was not responsive. Ms. Thames testified that inmates in the pod began attacking Defendant and that she "was trying to get them to stop and stand down and return to their . . . bunk area." She recalled that, as inmates moved away from Defendant, he ran out of the pod. When Ms. Thames followed Defendant, he told her that he "didn't do anything."

On cross-examination, Ms. Thames testified that Whiskey Unit contained roughly 520 inmates and that they were divided into four pods, with each pod having one pod officer. She said that each pod also had an office for a case manager. Regarding her role as a case manager, Ms. Thames explained that she helped inmates "with their programming, rehabilitative services, stuff like that." Ms. Thames said that Defendant complied with her orders after she followed him out of the pod.

Brooke Peterson testified that, at the time of the offenses, she was a licensed practical nurse employed at TTCC as a "floor nurse" and mental health nurse. She recalled that on August 30, 2019, she was passing out medication in Charlie Unit when she heard a "man-down button pressed" and the victim "in distress." Ms. Peterson stated that she ran to the victim's office in the Whiskey-Bravo pod and found her lying on the floor unclothed from the waist down. She said that the victim had "a massive amount of bleeding coming from her head and lower part of her body" and that she was "unrecognizable[.]"

Ms. Peterson described her assessment of the victim's injuries as "life-threatening." She testified:

> The most concerning injury was the lung puncture that [the victim] had. She had her lungs filling up with blood. She had a hemopneumothorax and, which is a massive hemorrhaging, which can cause death and, and can be fatal within no time, unless treated. So, we immediately applied oxygen to supplement her with oxygen. And applied intravenous fluids to supplement for all the blood loss that she was having, because her blood pressure was rapidly dropping to fatal rate.

She continued:

> As soon as I got into the room, I alerted the officers to make sure they had 911 on the phone . . . and tell them to automatically have Air Evac in flight. She had multiple stab wounds to the head, eyes, face; she had a lung puncture and a few on the back and front, in front of her chest[.]

Ms. Peterson said that she saw blood coming out of the victim's "vaginal area" and on the victim's inner thighs; she stated, "[T]here was a pretty good amount of blood, more than usual, even if a woman was on her cycle, coming from her vaginal area." Ms. Peterson testified that she recovered a prison shank, or knife, from underneath the victim's head. She said that the shank was a curved piece of metal and made from the handle of a wheelchair.

Ms. Peterson testified that, prior to the assault, she had helped with Defendant's mental health treatment. She said, however, that Defendant was non-compliant in taking his medication "[m]ost of the time[.]" She testified:

> He either just didn't want to take it. He didn't want to get out of bed to take his medicine or he was an avid drug user, so that made non-compliance, because we would have to take their medication away for 90 days at a time, until they could prove that they were sober. Because it would cause adverse reactions if they were doing drugs on top of taking mental health medications.

On cross-examination, Ms. Peterson testified that TTCC was not a facility where employees could force inmates to take medication. She explained, "They can refuse up to three times, and then we do counseling. But if they choose not to take the medication, we can't make them." She said that counselors would explain to inmates "what could be the adverse reactions of not taking . . . medication." She said that the victim had been counseling Defendant to make sure he was stable while not taking his medication. She recalled that Defendant had been off his medication because he had tested positive for methamphetamine use.

Meredith Boggs, a registered nurse, testified that she worked as a sexual assault nurse examiner, or SANE, at Vanderbilt. She stated that, on the evening of August 30, 2019, she was consulted to see the victim. Ms. Boggs said that, when she entered the victim's hospital room and introduced herself, she noted that the victim had "severe physical trauma" such that she was surprised the victim was conscious and able to communicate.

Ms. Boggs testified that, after the victim consented to an exam, she took photographs of the victim's injuries, completed a full physical assessment, and documented her findings. She noted that the victim denied any recent sexual activity within the past five days. The victim told Ms. Boggs that she lost consciousness during the attack but recalled being hit "five to six times in the face[.]" Ms. Boggs stated that she documented sixteen injuries to the victim's head alone—twelve of which were deep puncture-type wounds.

Regarding the victim's pelvic exam, Ms. Boggs testified that she found no injury internally or externally that she could visualize. She noted, however, that there was a small amount of blood in the victim's vagina and what appeared to be dried blood on her inner thighs. Ms. Boggs stated she believed the blood was the result of "microabrasions" to the vagina; she said that, although such abrasions cannot be seen with the naked eye, they produce bleeding. Regarding the blood on the victim's inner thighs, Ms. Boggs noted that the victim had no lacerations to her legs. She stated that she "had no reason to suspect that that blood was derived from anywhere else. It seemed that it was what . . . was coming from her vagina, where it was found to be bleeding." Ms. Boggs testified that she collected vaginal and oral swabs from the victim as part of the examination.

Ms. Boggs stated that the victim's vaginal bleeding was consistent with forced penetration. She testified, "Usually when there's forced penetration, there is lack of lubrication, and there's also, so the tissues are not relaxed, the muscles, the tissue is not relaxed, and so that forced penetration will cause bleeding in the microabrasions that I referred to." Ms. Boggs said that she also documented bruising to the victim's right inner thigh, which was also a sign of forced penetration. Ms. Boggs recalled that she asked the victim if she had any physical pain to the genital region and that the victim "did complain of physical pain. And [the victim] also said . . . that she had vaginal pressure." Ms. Boggs explained that victims of sexual assault often describe vaginal pain, pressure, or fullness when asked about any sensation post-assault. She said that the victim's description of vaginal pressure was consistent with forced penetration.

Ms. Boggs recalled that the victim had been air-lifted to Vanderbilt as a Level 1 trauma, which Ms. Boggs described as "the most severe." She described the victim's injuries as life-threatening. Ms. Boggs testified that she conducted the examination at approximately 10:00 p.m. on August 30, 2019, about four hours after the assault.

Ramon Sherrell testified that he worked as a Special Agent in Charge for the Tennessee Department of Correction (TDOC) and that he investigated criminal and administrative matters within the department. He said that on August 30, 2019, he responded to TTCC after the victim had been life-flighted to Vanderbilt. He said that he gathered evidence, including surveillance video footage from inside the Whiskey-Bravo

pod. This surveillance video footage was entered as an exhibit to his testimony and shown to the jury. Agent Sherrell explained that the windows of the victim's office had been covered because the office was located next to the inmate showers. He said that the surveillance video showed Defendant entering the victim's office at 5:55 p.m. and sitting down across from the victim at her desk. He said that the initial meeting lasted about thirty minutes and that the door to the victim's office remained open the entire time. The video then showed Defendant getting up and leaving the office to go upstairs; when Defendant returned to the office, he entered and shut the door behind him. Agent Sherrell noted that Defendant was carrying a book and a coffee bag. Agent Sherrell testified that the video next showed Defendant's walking around the victim's desk and striking her several times. He testified, "And if you look at the very bottom, you can see [Defendant's] movements. [The victim] is laying on the floor at this time. As she testified to, she got knocked out."

Agent Sherrell testified that, at the time of the assault, inmates were having dinner and that it was a "very loud" environment inside the pod. Agent Sherrell recounted from the video:

> [Defendant's] about to look out the window to see if anybody's watching or has seen what was going on. And when he realizes no one's watching, he goes back.
>
> . . . .
>
> So, [Defendant] gets up, comes to the door, walks out, and he walks along the back wall.
>
> . . . .
>
> You will see his movement to that trash can after the sink area. This, this is [Defendant] and he throws something away inside the trash can. It was . . . later found to be his blue shirt that he was wearing when he initially walked into this room. And it had blood splatter and blood stains on it, as well as his ID card that says [Defendant's name] and his TDOC number.
>
> . . . .
>
> [Defendant] just reentered the office to grab his books and papers and he walks behind the desk, to look at [the victim], who's lying on the floor. And then, he exits and closes the door.

Agent Sherrell testified that other inmates began attacking Defendant and that Defendant took off his shirt to show that he did not have any weapons; Agent Sherrell noted, however, Defendant had a knife sheath wrapped around his chest. Agent Sherrell said that Defendant was also later assaulted by a staff member at TTCC and that Defendant suffered broken ribs and a punctured lung. He testified that there was a pending federal investigation into the staff member's assault of Defendant.

Agent Sherrell said that, after viewing the surveillance video, he conducted interviews, photographed the scene, put a "mail cover" on Defendant's mail, spoke with nurses and prison staff, collected evidence, and obtained a DNA sample from Defendant. Agent Sherrell said that he also interviewed Defendant around 1:00 a.m. on August 31, 2019. Agent Sherrell said that, after reading Defendant his *Miranda* rights, Defendant waived his rights and agreed to speak to him. He said that he noticed blood on Defendant's hands during the interview, so he swabbed Defendant's hands for DNA evidence.

In the recorded interview, which was played for the jury, Defendant began by stating:

> It wasn't my fault. It wasn't like I was controlling my hand. It wasn't like I was so mad at her that I want to hurt her. It's, that's something I've been having. I went to her to get help for, I hear voices and see things. I have depression, anxiety, and OCD. And I was, I sat there for quite a while explaining to her the symptoms I've been having and telling her that, you know, I've been having thoughts, bad thoughts, and seeing, I've been going through a lot.

Defendant claimed that "what happened with" the victim was the result of his "problems with mental health." He admitted that he had stabbed the victim but claimed that he "wasn't in control" and that it "wasn't like [he] was actually doing it . . . when it started happening."

Defendant admitted that he used methamphetamine three to four hours before he attacked the victim. He admitted that he had used methamphetamine previously, and he said that, when he used it, he would remove his clothes and "touch" himself. Defendant told Agent Sherrell that he "kept trying to quit drugs" but would only be able to do so for two days or so. Defendant continued, "[B]ut mixed with mental health, I guess it's a bad combination cause I've been hearing influencing voices trying to tell me, you know, to do stuff and I, I resist and I resist, but my, I don't know." Defendant suggested that he may have taken some "bad drugs" on the day of the offense.

- 8 -

When Agent Sherrell asked Defendant if he was taking medication, Defendant stated:

> I wish. I need Zyprexa. I've been taking it eight years. I've been off it two months. It's been getting worse and worse. Hearing voices, seeing things. My OCD has really been acting up. Depression from nowhere. That's what I was going to see [the victim] about, trying to get back on my meds.

Defendant claimed that, while in the victim's office, he told the victim that he had been hearing voices. He said that, as he was giving the victim the rolling papers and light bulb, he began thinking about giving her his needles too so that he would not be tempted to use drugs again. Defendant said that, during those thoughts, "It start[ed] . . . the stabbing." Defendant admitted that he had obtained a knife in the days before the assault and that he had concealed it in a sheath, which he hung around his neck with a shoestring under his shirt. He claimed that he had the knife for his own protection, but he admitted that he had made a statement before the assault that he wanted to stab Sergeant Anderson if he did not make parole. Defendant denied saying that he wanted to stab the victim and Ms. Golden. He claimed that he was not angry with the victim before he went into her office, and he did not recall her saying anything to upset him.

Defendant told Agent Sherrell that he had paranoid schizophrenia, which caused him to hear voices and see things, and that he usually resisted when the voices told him to do things. Defendant admitted that he pulled down the victim's pants and underwear but claimed that he did not know why he did it. Defendant acknowledged that he "violated" the victim by pulling down her pants and touching her hair. He denied raping the victim but said that he remembered being on top of her. He said that he did not recall pulling down his own pants but acknowledged that he later needed to fix the drawstring on his pants.

Defendant claimed that he had previously heard voices, which had made him unstable; he said, however, that he was not hearing voices during the interview with Agent Sherrell. Defendant repeatedly expressed remorse for the victim's injuries and asked if the victim was "okay." He told Agent Sherrell that he "hate[d] that this happened," that he prayed that the victim was "alright," and expressed gratitude that the victim was still alive.

Agent Sherrell testified that, as part of his investigation, he submitted numerous items of evidence to the Tennessee Bureau of Investigation (TBI) Crime Laboratory, including the sexual assault examination kit collected by the SANE nurse at Vanderbilt. When asked about his reference to a "mail cover," Agent Sherrell testified:

Inmates inside of a prison send and receive mail regularly. And if they are under investigation by me, I put a mail cover on them. Which basically means that when an inmate sends mail or an inmate receives mail, the prison copies that mail, that is not legal, legal mail, such as attorney/client privilege mail, we do not copy that type of mail.

Agent Sherrell said that, during the use of the mail cover, he discovered a letter written by Defendant in June 2021 to another inmate that contained statements about the events of August 30, 2019. In the letter, which Agent Sherrell read to the jury, Defendant claimed that he had "psych meds" but that his medication had been stopped "for a while" after he failed a drug test. He said that Defendant admitted to purchasing the knife about a week before the attack, and he said that he was "smoking," "snorting," and "shooting" methamphetamine. He said that methamphetamine was a "sexual drug for [him]" and that he "got into the habit of stripping down naked and flashing female guards." Defendant claimed that he "started getting verbal messages" from his knife; he said that the knife told him to kill certain people but that it told him "not to kill anyone until [he] had gone up for . . . parole." Defendant claimed that he "almost killed a punk the day before the incident" but that he "told him that it's not the time for that crazy yet" because he "had parole the next day."

Defendant wrote that he was denied parole and told that he would start serving his five-year sentence in August 2021. He commented, "When I heard that, I knew I didn't even want to live that long." Defendant said that, after being denied parole, he went to the victim's office and tried to resume his medication. He said that he "was going to try one last time to get back on . . . Zyprexa" and then he was going to "go down the list" of people he was going to kill. Defendant said that he gave the victim his drug contraband to show her that he was trying to quit drugs. He claimed that the victim told him that he sounded "like a junkie begging for dope." Defendant said that, after giving the victim the drug contraband, he "reached under [his] shirt and started stabbing" the victim "in the head." Defendant claimed that he "saw it happen before it happened." He claimed not to remember where he stabbed the victim but only to remember that he was not "in control." Defendant admitted to pulling down the victim's pants, but he claimed not to remember whether he raped her. Defendant further admitted that he did not think that he was "capable of such evil and violence." He said that he saw "there was blood everywhere" once he "came to [his] senses."

Agent Sherrell testified that Defendant's parole hearing was held hours before the attack and that Defendant was denied parole. He testified that Defendant was seen by Trousdale Medical before his interview and that, after the interview, Defendant was taken to Riverbend Maximum Security Institution and then transported to Skyline Medical Center for further treatment. Agent Sherrell agreed that Defendant had been prescribed

Zyprexa while at TTCC and that Defendant had been taken off the medication after he failed a drug screen.

Gabriel Mendes Vasquez testified that he was incarcerated at TTCC on August 30, 2019. He said that he had just finished exercising and was going upstairs in the Whiskey-Bravo pod when he saw through "a little square" on the door to the victim's office "a white leg" and "somebody's butt." Mr. Vasquez testified that it looked like someone was having sex inside the office and that he saw one person on top of another. He agreed that Defendant was on top of the victim, moving in a "thrusting motion" and that he thought Defendant and the victim were having sex. Mr. Vasquez testified that he was surprised and thought "wow, what a lucky man. That's incredible, incredible." Mr. Vasquez testified that Defendant "kind of turned around and looked at [him]" and that Mr. Vasquez kept going up the stairs. He said that he told his friends what he saw happening in the victim's office and that they "couldn't believe it." Mr. Vasquez recalled that, as he and his friends started down the stairs, Defendant "came running upstairs" with specks of blood on his face. He stated that he and another inmate went to inform Officer Bass what was happening.

On cross-examination, Mr. Vasquez explained that inmates were allowed to move from pod to pod within Whiskey unit. Regarding the windows in the victim's office, Mr. Vasquez said that there were two windows but that they were covered. He said that he looked through "a clear, small square" on one of the windows.

Stacy Flemming testified that he had been an inmate housed in the Whiskey-Bravo pod at TTCC on August 30, 2019, and that he had been friends with Defendant. Mr. Flemming said that he arrived at TTCC in December 2018 and that he met Defendant upon his arrival. He said that Defendant "wasn't gang related or anything and he wasn't any type of trouble[.]" Mr. Flemming said that because he and Defendant were housed in the same pod, he saw Defendant daily and that he became friends with Defendant because Defendant did not cause him "any kind of stress [or] trouble."

Regarding the incident on August 30, 2019, Mr. Flemming stated that he had witnessed Defendant's coming into the pod with some paperwork in his hand and that Defendant then went into the victim's office. Mr. Flemming explained that he had been watching Defendant because he had been wanting to talk to Defendant about something. Mr. Flemming said:

> And I seen [Defendant], I thought maybe [the victim] had him doing
> some kind of therapeutic exercise, you know, because he would be up one
> second and me and him made eye contact. He frowned up, and you know,

- 11 -

he'd go down and come back up. And I thought maybe she had him doing some kind of therapeutic exercise, until I realized what had happened.

Mr. Flemming testified that, after Defendant exited the victim's office, Defendant went into the bathroom and changed his shirt. He said that Defendant "came out and he put his shirt and ID in the trash can." He testified that he had spoken to Defendant daily and that his last interaction with Defendant was on the day before the attack. Mr. Flemming testified that Defendant was "highly intelligent," and he described Defendant's day-to-day behavior as "normal."

TBI Special Agent Kenna Icet, an expert in forensic biology, stated that she tested several items of evidence in connection with Defendant's case. Agent Icet said that she first tested the victim's belt for blood and DNA. She said that the DNA profile found on the belt was consistent with the victim's but that, due to the limited minor contributor profile obtained, "interpretation of the minor contributor profile [was] deemed to be inconclusive." Agent Icet testified that she performed a presumptive test for semen on the victim's pants, underwear, and vaginal swabs, which did not indicate the presence of semen. She said that it would lower the likelihood of discovering sperm if a person did not ejaculate; she further explained that blood from the victim's vagina could have removed any sperm. Agent Icet stated that the victim's vaginal swab did not include enough DNA for her to generate a profile and that the presence of blood could make it difficult to develop a DNA profile. She stated that she also tested the knife found by the victim's head and determined that the victim's blood was on the handle.

Patricia Stallings, Defendant's mother, testified that Defendant began taking Zyprexa after high school and that he was prescribed the medication for "at least" twenty years. She said that Defendant hallucinated and was "restless" and "fidgety" when he was not on the medication. Ms. Stallings recalled one occasion when Defendant was off his medication, stating:

[W]e [were] driving around, and [Defendant] was, Momma, look, in that car over there, it's aliens, aliens. I said . . . [t]here's nothing over there, and he would be kind of like running from them. He was, that day, he was running from them. He was just trying to get away.

Ms. Stalling said that Defendant was a "totally different person" when he was on the medication and that he did not experience the hallucinations and restlessness. Ms. Stallings agreed that Defendant sometimes chose not to take his medication. She testified that she was unaware if Defendant's use of illicit drugs ever caused him to hallucinate.

Following deliberations, the jury found Defendant guilty as charged. The trial court sentenced Defendant, as a career offender, to consecutive terms of sixty years for attempted first degree murder and sixty years for aggravated rape, for a total effective sentence of 120 years' confinement.

Defendant filed a timely motion for new trial, which was denied in a written order following a hearing. This timely appeal follows.

## II. Analysis

### A. Sufficiency of the evidence

Defendant contends that the evidence presented at trial was insufficient to support his conviction for attempted first degree murder. Defendant argues that no rational trier of fact could have found that he had the necessary premeditation and intentional mens rea for attempted first degree murder. He asserts that there was "not enough evidence to show beyond a reasonable doubt that Defendant prepared for the assault in advance or that it was his conscious objective or desire to kill" the victim. Defendant contends that the proof is sufficient only to show that he acted knowingly, and he asks this court to vacate his conviction and remand for entry of a judgment reflecting a conviction for attempted second degree murder. The State responds that the evidence is sufficient to sustain Defendant's conviction for attempted first degree murder as the proof amply establishes that Defendant acted with premeditation.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Bland*, 958 S.W.2d at 659. Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). On appeal, the defendant bears the burden of proving why the evidence was insufficient to support the conviction, *Bland*, 958 S.W.2d at 659, and the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

- 13 -

A person commits criminal attempt when, acting with the kind of culpability otherwise required for the offense, he "[a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" Tenn. Code Ann. § 39-12-101(a)(2) (2019). First-degree premeditated murder is the unlawful, intentional, and premeditated killing of another. Tenn. Code Ann. §§ 39-13-201, -202(a)(1) (2019). Premeditation is defined as "an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself." Tenn. Code Ann. § 39-13-202(e) (2019). However, the purpose to kill need not exist in the mind of the accused "for any definite period of time." *Id*. "The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." *Id*.

To determine an accused's mental state at the time of the decision to kill, courts frequently look to the circumstances surrounding the killing to ascertain if the proof is sufficient to support a finding of premeditation. *See State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005). Circumstances indicative of premeditation may include the use of a deadly weapon on an unarmed victim; lack of provocation by the victim; declarations of an intent to kill; the failure to render aid to the victim; facts indicative of a motive to kill the victim; the particular cruelty of the killing; the procurement of a weapon prior to the killing; preparations to conceal the crime before the crime is committed; destruction or secretion of evidence of the killing; and calmness immediately after the killing. *See State v. Thacker*, 164 S.W.3d 208, 222 (Tenn. 2005); *Bland*, 958 S.W.2d at 660.

When viewed in the light most favorable to the State, the evidence is sufficient to support Defendant's conviction for attempted first degree premediated murder as any rational juror could have found beyond a reasonable doubt that Defendant acted intentionally and with premeditation. First, the State offered proof that Defendant made statements that he was going to stab the victim, Ms. Golden, and Sergeant Anderson if he was denied parole. Defendant's parole was denied on August 30, 2019, and he carried out his threat on the victim later that evening. Additionally, that Defendant intended to kill the victim can be reasonably inferred from the number and location of the victim's stab injuries. Defendant repeatedly stabbed the victim in the face, head, and neck. Ms. Boggs testified that the victim had life-threatening injuries, including twelve deep puncture wounds to her head alone.

Other facts from which the jury could have reasonably inferred premeditation include Defendant's procurement of a weapon, his unprovoked attack on an unarmed victim, his failure to render aid to the victim, and his secretion of evidence after the attack. Defendant admitted both to Agent Sherrell and in his letter to an inmate that he had

purchased the knife several days before the attack. After leaving the door open in his first meeting with the victim, Defendant returned to her office with the knife and closed the door. The victim was unarmed, and she did not provoke Defendant. After repeatedly stabbing the victim, Defendant did not render aid to the victim nor did he alert any of the guards or other inmates that the victim needed medical assistance. Instead, Defendant began secreting evidence of his attack. Defendant dropped his bloody shirt and identification badge into a trash can and then attempted to wash blood off his hands at the sinks. He then returned to the victim's office to retrieve some of his items that he had left there.

In his brief, Defendant argues that a knowing mens rea more aptly fit the "out-of-body experiences" that he described when attacking the victim. However, the jury was free to disregard Defendant's explanation of the offense; it is the role of the jury to assess credibility, and it is not the role of this court to reassess the jury's credibility determinations. *See Bland*, 958 S.W.2d at 659. Clearly, by its verdict, the jury rejected Defendant's claim that he was not in control of his actions, as was its prerogative.

We conclude that the evidence is sufficient to sustain Defendant's conviction for attempted first degree premediated murder and that he is not entitled to relief on this issue.

### B. Insanity defense

Defendant next asserts that he presented clear and convincing evidence that he "met the two criteria for the affirmative defense of insanity[.]" Defendant argues that no reasonable jury could have had any serious or substantial doubt that he suffered from a severe mental disease or defect at the time of the offenses and was unable to appreciate the wrongfulness of his acts. The State responds that the jury reasonably rejected Defendant's insanity defense.

With respect to Defendant's insanity claim, Tennessee Code Annotated section 39-11-501 provides:

> (a) It is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of severe mental disease or defect, was unable to appreciate the nature or wrongfulness of the defendant's acts. Mental disease or defect does not otherwise constitute a defense. The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

- 15 -

(b) As used in this section, "mental disease or defect" does not include any abnormality manifested only by repeated criminal or otherwise antisocial conduct.

(c) No expert witness may testify as to whether the defendant was or was not insane as set forth in subsection (a). Such ultimate issue is a matter for the trier of fact alone.

"[A]ppellate courts in Tennessee should reverse a jury verdict rejecting the insanity defense only if, considering the evidence in the light most favorable to the prosecution, no reasonable trier of fact could have failed to find that the defendant's insanity at the time of the offense was established by clear and convincing evidence." *State v. Flake*, 88 S.W.3d 540, 554 (Tenn. 2002). This standard of review is similar to the reasonableness standard reviewing courts apply when assessing the sufficiency of the evidence; appellate courts "should consider all the evidence in the record in the light most favorable to the [S]tate in determining whether the jury appropriately rejected the insanity defense." *Id*. When the evidence is disputed, this court will "rarely reverse a jury's rejection of the insanity defense under this deferential standard of review." *Id*. at 556.

The defendant has the burden of establishing the affirmative defense of insanity. *Id*. at 554. The Tennessee Supreme Court has "explicitly reject[ed] the notion that the State must rebut defense proof of insanity with substantial evidence." *Id*. "In determining whether a defendant is insane, a jury is entitled to consider all the evidence offered, including the facts surrounding the crime, the testimony of lay witnesses, and expert testimony." *Id*. at 556. In determining the defendant's mental status at the time of the alleged crime, the trier of fact may look to the evidence of his actions and words before, at, and immediately after the commission of the offense. *State v. Sparks*, 891 S.W.2d 607, 616 (Tenn. 1995); *Humphreys v. State*, 531 S.W.2d 127, 132 (Tenn. Crim. App. 1975). "Where there is a conflict in the evidence, the trier of fact is not required to accept expert testimony over other evidence and must determine the weight and credibility of each in light of all the facts and circumstances of the case." *Flake*, 88 S.W.3d at 554 (citing *Edwards v. State*, 540 S.W.2d 641, 647 (Tenn. 1976)). It is not the role of this court to reweigh the evidence or reevaluate the jury's credibility determinations. *Id*.

Considering the evidence in the light most favorable to the State, we conclude that a reasonable jury could have found that Defendant's insanity at the time of the offenses was not established by clear and convincing evidence. *See id*. In unsworn statements made to Agent Sherrell in his interview, Defendant claimed that he suffered from paranoid schizophrenia, but Defendant did not present any expert testimony to establish that he had been diagnosed with schizophrenia or that schizophrenia qualified as a severe mental disease or defect. Although the victim testified that Defendant had a care "level of two,"

which meant that he had a mental health diagnosis; she did not identify Defendant's diagnosis, and she said that Defendant did not express having any mental health issues the day of the attack. Defendant's mother testified that Defendant had taken Zyprexa for about twenty years, but she did not testify as to why he was prescribed Zyprexa; she only stated that she believed he hallucinated when he was off the medication. While Defendant claimed to experience hallucinations and to hear voices, he also admitted to using methamphetamine, and he acknowledged that his drug use, in combination with mental health issues, caused him to hear voices. Thus, we agree with the State that Defendant fell well short of establishing by clear and convincing evidence that he suffered from a severe mental disease or defect.

Moreover, Defendant failed to demonstrate by clear and convincing evidence that he was unable to appreciate the nature or wrongfulness of his actions due to a severe mental disease or defect. In his interview with Agent Sherrell, Defendant acknowledged that it was wrong to stab the victim and to sexually assault her. Defendant expressed remorse, stating that he "hate[d] that this happened," and he repeatedly expressed his hope that the victim was "alright." He also acknowledged that he violated the victim by pulling down her pants and touching her hair.

As noted by the State, this court has repeatedly concluded that a defendant's statements acknowledging wrongdoing and expressions of remorse support a rejection of an insanity defense. In *State v. Colvett*, this court relied in part on the defendant's statements that he regretted killing the victim and that he knew that killing the victim was wrong to affirm the rejection of an insanity defense. 481 S.W.3d 172, 198 (Tenn. Crim. App. 2014); *see also Holder*, 15 S.W.3d at 909, 912 (stating that a finder of fact may rely upon the "words of the defendant . . . after the commission of the offense" when concluding that a defendant failed to establish insanity by clear and convincing evidence). As in *Colvett* and *Holder*, Defendant's expressions of remorse and acknowledgement of wrongdoing after his attack on the victim suggest that Defendant was aware of the nature or wrongfulness of his actions and, therefore, support the jury's rejection of an insanity defense.

Additionally, Defendant's actions before and after his assault on the victim demonstrate that he appreciated the nature or wrongfulness of his actions. When Defendant returned to the victim's office with his drug paraphernalia, he closed the door, thereby limiting the ability of others to see inside the office. Then, during the attack, Defendant looked out the small window at the door to the office to see if anybody was watching or had seen what he was doing. Defendant left the office shortly after making eye contact with Mr. Vasquez, and then he immediately attempted to conceal evidence of the crime by throwing away his bloody shirt and identification badge and washing his hands. Based upon Defendant's efforts to conceal the crime, the jury could have reasonably inferred that

- 17 -

he was aware of the wrongfulness of his actions. *See Flake*, 88 S.W.3d at 556 (observing that "the facts surrounding the offense suggest[ed] the defendant realized his conduct was wrongful").

Considering the evidence in the light most favorable to the State, a reasonable jury could have found that Defendant's insanity at the time of the offenses was not established by clear and convincing evidence. Thus, Defendant is not entitled to relief.

### C. Improper prosecutorial argument

Defendant contends that the prosecutor engaged in improper argument in closing by misstating Tennessee law and vouching for witnesses. Specifically, Defendant asserts that that the prosecutor improperly told the jury during closing argument that voluntary intoxication by methamphetamine negated the affirmative defense of insanity, inquired as to whether Defendant should be given "license" to commit offenses merely because he was hallucinating, vouched for the State's witnesses by calling them "heroes," and compared Defendant to a Nazi. Defendant acknowledges that he did not object to any of the alleged improper arguments and that he did not raise this issue in his motion for new trial. He maintains, however, that he is entitled to relief via plain error. The State responds that Defendant has not established all the requisite factors for plain error relief.

A trial court has wide discretion in controlling the course of arguments and will not be reversed absent an abuse of discretion. *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001). Closing argument by a prosecutor "is a valuable privilege that should not be unduly restricted." *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001). That said, Tennessee courts have recognized numerous prosecutorial arguments as improper. It is improper for a prosecutor to engage in derogatory remarks, appeal to the prejudice of the jury, misstate the evidence, or make arguments not reasonably based on the evidence. *State v. Banks*, 271 S.W.3d 90, 131 (Tenn. 2008). "A criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." *Id*. Rather, "[a]n improper closing argument will not constitute reversible error unless it is so inflammatory or improper that i[t] affected the outcome of the trial to the defendant's prejudice." *Id*.

In *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003), this court listed five general areas of improper prosecutorial argument during closing: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt; (3) making statements calculated to inflame the passions or prejudices of the jury; (4) injecting broader issues than the guilt or innocence of the accused; and (5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge.

"In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." *State v. Pulliam*, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996). In *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976), this court listed the following factors to be considered when determining whether the improper argument of a prosecutor affected the verdict to the prejudice of the defendant:

1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.

2. The curative measures undertaken by the court and the prosecution.

3. The intent of the prosecutor in making the improper statement.

4. The cumulative effect of the improper conduct and any other errors in the record.

5. The relative strength or weakness of the case.

*Id*.

In this case, Defendant failed to raise a contemporaneous objection to any of the alleged improper arguments. The Tennessee Supreme Court has previously stated that "[i]t is incumbent upon defense counsel to object contemporaneously whenever it deems the prosecution to be making improper argument[,]" explaining that a timely objection gives the trial court the opportunity to assess the State's argument and to take appropriate curative action. *State v. Jordan*, 325 S.W.3d 1, 57-58 (Tenn. 2010). By failing to raise a contemporaneous objection and by failing to raise the claim in his motion for new trial, Defendant waived plenary review of the issue on appeal. *See* Tenn. R. App. P. 36(a)); *State v. Enix*, 653 S.W.3d 692, 700-01 (Tenn. 2022); *Jordan*, 325 S.W.3d at 58.

However, "when necessary to do substantial justice," this court may "consider an error that has affected the substantial rights of a party" even if the issue was waived. Tenn. R. App. P. 36(b); *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010). Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). In order to be granted relief under plain error, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Id*. at

640-41; *see also State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (Tennessee Supreme Court formally adopting the *Adkisson* standard for plain error relief). When it is clear from the record that at least one of the factors cannot be established, this court need not consider the remaining factors. *Smith*, 24 S.W.3d at 283. The defendant bears the burden of persuasion to show that he is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

Here, the record clearly establishes what occurred in the trial court. Regarding the prosecutor's argument about Defendant's admitted use of methamphetamine on the day of the assault, this court has previously observed that a jury could reasonably rely on a defendant's drug use to reject an insanity defense. *See State v. Smith*, No. E2023-00182-CCA-R3-CD, 2024 WL 3177927, at *9 (Tenn. Crim. App. June 26, 2024) (noting that "Tennessee Code Annotated section 39-11-501(b) states that insanity cannot be based on 'criminal' or other 'anti-social' behavior" and that "[a] reasonable jury could have found that the [d]efendant's drug use was the underlying cause of his psychosis[.]"). Thus, the prosecutor's argument that Defendant's methamphetamine use undercut his claimed insanity defense was not improper.[2]

Next, the record reflects that the prosecutor referred to a Winston Churchill quote from the Netflix series "The Crown" and argued that Mr. Churchill said that he had "witnessed scenes here today, the likes of which we have not seen since the darkest days of the blitzkrieg from the war. But along side this suffering, I have also seen heroism. And where there is heroism, there will always be hope." The prosecutor then stated that several witnesses had "demonstrated heroism" and again referred to the Churchill quote, saying that "[w]here there's heroism, there will always be hope." In making these comments, the prosecutor did not compare Defendant to a Nazi or to Nazi Germany. Additionally, the prosecutor did not vouch for the State's witnesses; the prosecutor made a fleeting reference to witnesses demonstrating "heroism" and was not expressing a personal belief in the truth or falsity of their testimonies.

In any event, even assuming all of these alleged errors and considering them cumulatively, we conclude that no substantial right of Defendant was adversely affected by the claimed errors. "For a 'substantial right' of the accused to have been affected, the error must have prejudiced the appellant. In other words, it must have affected the outcome of the trial court proceedings." *State v. Rimmer*, 623 S.W.3d 235, 278 (Tenn. 2021) (quoting *State v. Maddin*, 192 S.W.3d 558, 562 (Tenn. Crim. App. 2005)). In this case, overwhelming evidence established Defendant's guilt. The evidence showed that

---

[2] We note that the jury was properly instructed on the State's burden of proof in establishing the mens rea for the underlying offenses and on the proof required to establish that Defendant was insane at the time of the offenses.

- 20 -

Defendant threatened to stab the victim if he did not make parole and then, hours after he was denied parole, he attacked and repeatedly stabbed the victim with a knife that he obtained days before the assault. The victim, who was unarmed and did nothing to provoke the attack, suffered life-threatening injuries as a result. Regarding the aggravated rape, Defendant admitted that he removed the victim's pants and underwear; Mr. Vasquez saw Defendant thrusting on top of the victim and engaging in what he thought was sexual intercourse; and Ms. Boggs testified that the victim had multiple injuries consistent with forced penetration. Finally, as previously discussed, the proof fell well short of establishing by clear and convincing evidence that Defendant suffered from a severe mental disease or defect that rendered him unable to appreciate the nature or wrongfulness of his actions. Under these circumstances, Defendant has failed to show that the alleged instances of improper prosecutorial argument affected the outcome of the trial court proceedings. Thus, we conclude that Defendant is not entitled to relief via the plain error doctrine.

### III. Conclusion

Based upon the foregoing, we affirm the judgments of the trial court.


_s/Robert L. Holloway, Jr._
ROBERT L. HOLLOWAY, JR., JUDGE